David A. HAMMOND, Plaintiff,

v.

**COLEMAN COMPANY, INC., Defendant.**

No. Civ.A. 2:98–CV–123PG.

United States District Court, S.D. Mississippi, Hattiesburg Division.

July 22, 1999.

---

Michael Adelman, Adelman & Steiner, Hattiesburg, MS, for David A. Hammond, plaintiff.

James A. Becker, Jr., Watkins & Eager, Jackson, MS, for Coleman Company, The Coleman Company, Inc., defendant.

### MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

This matter is before the Court on Motion for Summary Judgment filed on behalf of the Defendant. The Court having reviewed the motion, the response, the briefs of counsel, the authorities cited, the pleadings and exhibits filed, and being otherwise fully advised in the premises finds as follows, to wit:

### FACTUAL BACKGROUND

On or about March 5, 1997, the Plaintiff David Hammond filled his Coleman lantern with Coleman fuel on the outside of his mobile home and then pressurized the lantern approximately 30 pumps as per the instructions. Hammond then carried the lantern into his home and lit it whereupon he alleges that an initial burst occurred and thereafter a second burst or explosion occurred in which he was allegedly hit with fuel from the lantern. The Plaintiff suffered second and third degree burns and the total destruction of his mobile home as a result of the alleged incident. Plaintiff alleges that he has lost mobility and strength in both upper arms and suffers from relentless pain. Plaintiff's chest and arms in particular are severely disfigured and he has incurred medical expenses in excess of $250,000 as a result of the March 5th incident.

Plaintiff filed his complaint herein alleging causes of action for a defective design of the lantern, manufacturing defects in the lantern and inadequate warnings and instructions as to the use of the lantern. Plaintiff designated Alvin Kirk Rosenhan as his only liability expert to render opinions in support of his claims.

The Defendant has filed the present Motion for Summary Judgment asserting that Rosenhan's impressions and opinions should be excluded because they lack the requisite standards of relevancy and reliability required for admission of expert testimony in federal courts. The Defendant asserts that if the Court does exclude Rosenhan's impressions and opinions, then summary judgment will be appropriate because the Plaintiff cannot satisfy his burden of proof. The Defendant further asserts that even if the Court were to conclude that Rosenhan's opinions are admissible, summary judgment is still proper because regarding Plaintiff's defective design claim, the Plaintiff has failed to identify a feasible alternative design as is required under Mississippi law. Further, that Plaintiff's expert Rosenhan admits that the design is not defective and that Rosenhan admits that the lantern was not defectively manufactured. Finally, Defendant contends that Plaintiff cannot satisfy his burden of proof on his inadequate/failure to warn and/or instruct claims because

Plaintiff has failed to offer any expert testimony regarding those claims.

Plaintiff has testified by deposition that as he was attempting to light the lantern there was a pop and then a second bigger pop and then the lantern exploded. At some time during the lighting procedure he alleges that liquid fuel squirted from the lantern onto his body and was ignited when the lantern exploded. Based on the Plaintiff's testimony Rosenhan has postulated as to three *possible* sources for the alleged spurt of fuel. The first possible source was the screw on cap, the second is the control knob/dip tube arrangement through which the fuel comes out of the reservoir, and the third was the air pump which is used to pressurize the fuel in the lantern to make it work. Rosenhan's testimony ultimately concludes with his opinion that the air pump mechanism was the most likely culprit of the explosion. Rosenhan examined the burned lantern as well as a new exemplar. He determined that the pump components appeared to be intact with the aluminum knob on the end burned off. Rosenhan ultimately concluded that the squirt of fuel had to be related to some defect in the air pump. Rosenhan never specifically identified any defect in the subject lantern pump nor did he do any test which could confirm or recreate any such defect which could have caused the alleged squirt of fuel as alleged to have occurred by the Plaintiff.

### STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v.*

*State of La. (Bd. of T. for State C. & U.),* 757 F.2d 698, 712 (5th Cir.1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis,* 799 F.2d 218, 222 (5th Cir.1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company v. OKC Corporation,* 812 F.2d 265, 272 (5th Cir.1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, ... all other contested issues of fact are rendered immaterial. *See Celotex,* 477 U.S. at 323, 106 S.Ct at 2552." *Topalian v. Ehrman,* 954 F.2d 1125, 1138 (5th Cir.1992).

In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin,* 736 F.2d 175, 178 (5th Cir.1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on

his motion. *Union Planters Nat. Leasing v. Woods,* 687 F.2d 117 (5th Cir.1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian,* 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John,* 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion. *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.,* 584 F.2d 111, 114 (5th Cir.1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting Antitrust Lit.,* 672 F.2d 436, 440 (5th Cir.1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed.R.Civ.P. *See also, Union Planters Nat. Leasing v. Woods,* 687 F.2d at 119.

While generally "[t]he burden to discover a genuine issue of fact is not on [the] court," (*Topalian* 954 F.2d at 1137), "Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment." *John,* 757 F.2d at 712, *quot-*

*ing Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410 (5th Cir.1980).

## STRICT LIABILITY IN MISSISSIPPI

Mississippi adopted the doctrine of strict liability, as set forth in Section 402A of the Restatement of Torts, Second, in the case of *State Stove Manufacturing Company v. Hodges,* 189 So.2d 113, 118 (Miss.1966), *cert. denied sub non., Yates v. Hodges,* 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967).

Section 402A(1) of the Restatement provides that, "One who sells any product in a defective condition unreasonably dangerous to the consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property ..." *Jackson v. Johns–Manville Sales Corporation,* 727 F.2d 506, 511 (5th Cir.1984); *State Stove Manufacturing, supra; Ford Motor Company v. Matthews,* 291 So.2d 169, 171 (Miss.1974).

Under Mississippi's version of strict liability for unreasonably dangerous products, manufacturers are not insurers of the products they produce; the existence of a product defect must be established before recovery may be obtained for a resulting injury. *Walton v. Chrysler Motor Corporation,* 229 So.2d 568, 572 (Miss.1969), overruled on other grounds; *General Motors Corporation v. Howard,* 244 So.2d 726, 728 (Miss.1971); *Jones v. Babst,* 323 So.2d 757, 759 (Miss.1975). Under this version of strict liability as adopted by Mississippi, three elements must be established by the proof before strict liability may be imposed:

(1) that the plaintiff was injured by the product;

(2) that the injury resulted from a defect in the product which rendered it unreasonably dangerous; and

(3) that the defect existed at the time it left the hands of the manufacturer.

*Early–Gary, Inc. v. Walters,* 294 So.2d 181 (Miss.1974).

Under the stated intent of effectuating tort reform, Mississippi codified the doctrine of strict liability effective July 1, 1993, Miss.Code Ann. § 11–1–63 (1972). That section provides, in pertinent part;

(a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

(i) 1. The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or

2. The product was defective because it failed to contain adequate warnings or instructions, or

3. The product was designed in a defective manner, or

4. The product breached an expressed warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and

(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

The plaintiff's complaint is cast under Sections (a)(i) 1, 2 and 3—manufacturing defect, inadequate warnings or instructions and design defect, respectively. He has not set forth a claim for breach of warranty. At oral argument Plaintiff conceded that he is proceeding only under a theory of defective manufacture.

## ADMISSIBILITY OF EXPERT TESTIMONY

Since the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), federal courts have heeded the admonition set forth therein that they should take seriously their role as "gatekeepers" of testimony offered by expert witnesses in federal courts. The initial reaction to *Daubert* was that it was a victory for the *Daubert* plaintiffs in that it vacated a Ninth Circuit opinion which upheld the exclusion of Plaintiff's experts in one round of the Bendectin birth defect cases. The Supreme Court in *Daubert* said the *Frye* general acceptance test for expert testimony had been superseded by Rule 702 of the Federal Rules of Evidence which went into effect in 1975. Rule 702 provides

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

A primary requisite of the rule is that the evidence or testimony "assist the trier of fact to understand the evidence or determine a fact in issue." The commentators universally agree that the effect of *Daubert* was not the loosening of the allowance of expert testimony but in fact a tightening thereof. In fact when *Daubert* was vacated and remanded to the Ninth Circuit, the Ninth Circuit again upheld the district court's exclusion of the plaintiff's expert witnesses based on the new standard enunciated in *Daubert. Wm. Daubert, et al. v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir.1995). Thereafter the United States Supreme Court denied certiorari. *Daubert, et al. v. Merrell Dow Pharmaceuticals, Inc.,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995).

The cases and commentaries interpreting *Daubert* are legion at this point. The Supreme Court in *Daubert* enumerated several factors to be considered by the Court in determining whether or not a particular expert witness's testimony was relevant and reliable to the point that it

should be allowed in federal court. Those factors are not exclusive and were merely presented as a guideline. The federal courts were instructed that the *Daubert* standard is "a flexible one" to be applied according to the facts and circumstances of each individual case. 509 U.S. at 594, 113 S.Ct. 2786. After *Daubert*, there was much discussion as to whether or not it applied merely to cases involving scientific knowledge or whether it should be expanded to include all expert testimony regardless of its scientific basis. The Supreme Court answered that question in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The *Kumho* court held

> We conclude that *Daubert's* general holding—setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.

526 U.S. at ——, 119 S.Ct. at 1171. Ultimately "the objective of that [gatekeeping] requirement is to insure the reliability and relevancy of expert testimony." *Kumho*, 526 U.S. at ——, 119 S.Ct. at 1176. In *Kumho* "the relevant issue was whether the expert could reliably determine the cause of [the] tire's separation." 526 U.S. at ——, 119 S.Ct. at 1177. That is the same type of issue facing this Court, i.e., whether or not Rosenhan can reliably determine the cause of the lantern's explosion.

■■■ This Court has been instructed by *Kumho* interpreting *Daubert* that the Court is required to determine the reliability of the proposed expert's methodology and basis for arriving at his conclusions before such opinions are admissible. 526 U.S. at ——, 119 S.Ct. at 1177. The factors set forth in *Daubert* and recited in *Kumho* include whether the theory or technique can be and has been tested; whether or not it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation and whether the theory or technique enjoys general acceptance within a relevant scientific community. This Court recognizes that several of the factors listed above are not relevant to a determination of the issue before this Court. Therein lies the flexibility of the gatekeeping responsibility as mandated by the Supreme Court. As the Fifth Circuit has noted, several prior opinions on admissibility of expert testimony placed undue emphasis on the *qualifications* of a particular expert witness over the *reliability* of the basis or methodology of the expert's proposed testimony, and that such reflected a "pre-*Daubert*" scrutiny. *See, Watkins v. Telsmith*, 121 F.3d 984, 992 (5th Cir.1997). In this age of "post-*Daubert*" scrutiny, as directed by the United States Supreme Court in *Kumho*, this Court treads with trepidation into the responsibility placed upon the court as a "gatekeeper" of proposed expert testimony.

■■■ This Court has no problem in recognizing that Rosenhan has been accepted as an expert in numerous courts, both state and federal around the State of Mississippi. Indeed, it is not the contention of the Defendant that Rosenhan is not qualified as an expert in engineering. The Defendant, by this motion, has merely questioned the reliability of Rosenhan's methodology in reaching the conclusions which he has reached. The Defendant asserts that based on the opinions offered by Rosenhan, the jury would be left with nothing but speculation and conjecture to decide whether or not the Coleman lantern at issue was either defectively designed or manufactured in a defective manner. This Court cannot conclude from the deposition testimony of Rosenhan that he has stated any opinion that in fact the Coleman lantern was defectively designed or manufactured defectively. His testimony appears to present nothing to the trier of fact other than the possibility that the lantern mal-

functioned. Whether or not this was an inherent defect, a design defect, a manufacturing defect, or caused by some other reason is not adequately explained, or indeed is not explained at all, by Rosenhan. *Res ipsa loquitur* is not an appropriate doctrine in regard to a strict liability claim. *See generally, Cather v. Catheter Technology Corp.*, 753 F.Supp. 634, 638–39 (S.D.Miss.1991); and *Powe v. Wagner Electric Sales Corp.*, 589 F.Supp. 657, 661 (S.D.Miss.1984). Simply offering proof that damage occurred after the use of a product is not sufficient to establish liability. *Cather*, 753 F.Supp. at 639; *citing*, *William Cooper & Nephews, Inc. v. Pevey*, 317 So.2d 406, 409 (Miss.1975).

■ The expert witness Rosenhan has offered nothing more than the fact that the Plaintiff has testified that he was squirted with fuel and the lantern exploded and perhaps it was caused by three possible malfunctions, two of which are somewhat discredited by Dr. Rosenhan in his later reports and the third possibility (the one advanced by Plaintiff) was discredited in his earlier deposition. Dr. Rosenhan never gives an opinion as to what probably happened. Dr. Rosenhan's repetition of Plaintiff's testimony is not helpful to the jury. The Plaintiff himself can testify to what happened to him. The balance of Dr. Rosenhan's testimony is speculative. Dr. Rosenhan's testimony that since the Plaintiff testified he was squirted with fuel and the lantern exploded, there must be a defect in the lantern is without sufficient reliable support to make it admissible. Dr. Rosenhan never talks in terms of probability, only possibilities. He has not attempted to simulate or recreate the incident of March 5 and offers no opinion that such an event could be recreated. Plaintiff's proposed expert conducted no tests, has never designed nor manufactured nor had experience in the designing or manufacturing of lanterns, and has never before testified in a lantern case. On page 22 of his deposition, Dr. Rosenhan indicated that it would do no damage to the remains of the burned lantern to cut into the fuel reservoir tank to see what had happened to the pump assembly. In that testimony he had identified this assembly as the most likely culprit of the explosion of the three possibilities that he discussed. This was never done. The speculative nature of Dr. Rosenhan's testimony is best illustrated in his own reports and deposition testimony.[1]

1. In his first report to counsel for Plaintiff dated January 8, 1998, Dr. Rosenhan pointed out three possible locations for the "source of the leak", but stated "given the total destruction of the subject lantern, I have no comment at this point regarding either of the three sources of leakage." In his report of December 28, 1998, Dr. Rosenhan again pointed out that the three obvious sources of the leak of fuel are:

    (1) filler cap
    (2) pump assembly
    (3) joints between the fuel reservoir, control valve and burner assembly.

With regard to the first two, Rosenhan opined in this later reports that any leak would instantly manifest itself on the outside of the lantern and Mr. Hammond would have instantly perceived such and been made aware of loose fuel. Thus, Dr. Rosenhan indicated that he did not think the filler cap or pump assembly would have been the source of the leak. He then stated that "the third source is internal and any leak would accumulate fuel inside the globe."

In his report of January 22, 1999, he seems to re-emphasize his feeling that the source of the leak would likely have been in the joints between the fuel reservoir and the burner assembly. He said "while the other two means could leak, any such leak would immediately be made obvious to the user. However, a leak from item three would be initially hidden by the collar assembly." He continued, "as may be noted from the assembly drawings of the subject lantern, there is a joint between the tank reservoir and the valve assembly as well as between the valve assembly and upwards toward the burner assembly. There is the ability for either of these joints to leak fuel, which is under pressure, and the leaking fuel would accumulate in volume behind the collar assembly." Dr. Rosenhan seemed to place a fair amount of emphasis on the fact that if the leaking occurred between the tank and the valve assembly that the vapors would be caught behind the globe and thus could build up to be the source of the ignition. He then stated "it is impossible to pinpoint the exact source, area, or size of any fuel leak due to the overall damage and total

destruction of the subject joints, the joint sealant, and component parts."

However, in his deposition testimony given in June of 1998, before his report of January 22, 1999, Dr. Rosenhan mentioned the three potential sources and on page 16 stated "I don't know which of the three would be the culprit." He then stated "that the seal or the continuity or the leaking between the bottom of the valve assembly and the tank seemed to be intact." He was then asked

Q. So you would put that the most unlikely?

A. Yes sir. If I had to rank these, which I am thinking we are going to do, I would put that as number three because that does seem to be intact.

This is contrary to the reports which he later furnished in which he opined that he thought the joints between the fuel reservoir and the burner assembly were the most logical cause of the leak because any leak from the filler cap and pump assembly would have been noticeable to the plaintiff. When asked if he thought this was the source of the leak, he responded "Well, I would be speculating if I said that's what it was, yes, sir .... but I have not tested or evaluated that for any leakage at this point, and, plus it's damaged considerably. I don't know that any such test would be conclusive at this point." (Deposition, page 17). Although in his later reports Dr. Rosenhan stated his view that the valve assembly connection was the most likely source of the leak, he never explained his earlier deposition testimony in which he stated he felt the valve assembly to be the least likely source because the seal "seemed to be intact."

Another difficulty for Plaintiff, not adequately addressed by Dr. Rosenhan, concerned the missing cap from the fuel reservoir. He said "We do have a missing cap that either melted off, fell off, or ultimately got blown off due to the heat flux." It seems incredible to the Court that if the heat melted the brass cap from around threads, that there would not have been some residue left there indicating the cap had been burned off or that the threads would have been damaged if it had been blown off. Nevertheless, it is Dr. Rosenhan's testimony that he saw no damage to the threads and no apparent residue from the cap that he alleges could have burned off. When he was asked, "well, you are speculating again aren't you" he responded "yes, sir, well, I would be speculating that it is more likely than not. I would be speculating if I said it was obvious it was going to go off." (Deposition, page 20). One explanation by Dr. Rosenhan for his opinion that the cap melted, was that it was made of brass. But other brass objects on the lantern didn't melt.

In his deposition, Dr. Rosenhan opined that out of three possibilities the one that he would first look at would be the air pump. In making his explanation he said "I made no attempt to look and see what's inside this thing, of course." (He was referring to the inside of the fuel tank where the remains of the pump should have been). He testified that he had never experienced liquid coming out of the pump of a Coleman lantern as he opined happened on this occasion. Deposition at 24. Dr. Rosenhan changed his opinion in his later reports and said the pump was not the most likely source of the leak since Plaintiff would likely have detected the leak if it had come from the pump.

Under cross examination, when Dr. Rosenhan was questioned about whether or not the accident could have occurred if a match or other open flame was being used to provide light as the plaintiff poured fuel into the kerosene lantern, which would also explain the missing cap, he responded

Q. And, again, the same result would occur if you had the fuel cap off and put an open flame near it?

A. And you had fuel loose. Just the cap off and a flame near it wouldn't do that as I understand happened. But, yes, if you were in the midst of pouring fuel, that sort of thing, yes, sir.

Though he never repudiated the above statement, Dr. Rosenhan did emphasize "two things: one, obviously, it was under pressure as opposed to simply a spill, and second of all, it was liquid as opposed to vapor." Deposition at 45. On page 35 of the deposition he indicated that "the plunger and part of the end cap, I think, are probably in the hole down there, but it would be necessary to dismantle or actually cut the reservoir to get to them." That was never done to see if any of this additional material which Dr. Rosenhan testified would be in the fuel reservoir would help establish plaintiff's case.

On page 13 of the deposition of Dr. Rosenhan—the following colloquy occurred:

Q. And if you were filling the reservoir and were using a match or lighter for the light, you would be liable to set it on fire. Isn't that true?

A. I would agree to that. If you had an open flame in close proximity to the filling operation, that would be a problem, certainly.

Dr. Rosenhan's reports and deposition testimony are simply too speculative to be helpful.

In *Daubert, supra* the Supreme Court in discussing Rule 702 stated that the word knowledge (which would be scientific knowledge, technical knowledge, or other specialized knowledge) "connotes more than subjective belief or unsupported speculation." 509 U.S. at 590, 113 S.Ct. 2786. The Supreme

Significantly, Plaintiff has established no previous failure of a Coleman lantern in the manner alleged by Plaintiff. Although other failures of other Coleman lanterns in a similar manner would not relieve Plaintiff of having to prove a defect in this particular lantern, it would be probative. In such a situation Plaintiff's expert testimony as to defect might not require quite as strict scrutiny. But in this case, Plaintiff not only failed to show similar defects in other lanterns, but the proffered testimony to show the defect in this particular lantern is entirely too speculative.

Plaintiff acknowledged at oral argument that the only theory upon which Plaintiff is proceeding is the theory of a manufacturing defect. In order to prevail, and avoid summary judgment, Plaintiff must produce some credible evidence that there was a manufacturing defect. Dr. Rosenhan's proffered testimony, offered in support of this theory, probably should be excluded simply because he has had no experience in manufacturing, designing, or testing lanterns, has conducted no tests on this lantern or any other lantern, and has never testified in a lantern case. But his proffered expert testimony is even more flawed than this lack of experience with lanterns in that the most that can be said for his testimony is that he speculated upon three possible causes, all three of which he criticized or questioned, to some degree, at one time or another.

If Dr. Rosenhan had opined: "Assuming the testimony of Plaintiff to be true, it is my opinion that the fire was caused by a leak around the burner assembly which resulted from a manufacturing defect.", then this Court would be faced with a closer question. But Dr. Rosenhan did not do this. He merely discussed three possible sources of malfunction and that based upon no testing and no prior experience with lanterns. This methodology and basis does not meet the criteria of *Daubert* and *Kumbo*.

Dr. Rosenhan has offered no feasible design alternative in regard to the defective design claim of the Plaintiff. This is a prerequisite under Miss.Code Ann. § 11-1-63 (1972). Neither has Dr. Rosenhan offered any opinion that the lantern was accompanied by inadequate warnings. Indeed all parties agree that the lantern contained a warning that it should not be utilized indoors. It is uncontroverted that the Plaintiff attempted to light the lantern inside his mobile home. Whatever warning was present, it is admitted by the Plaintiff that it was ignored.

Plaintiff offered no testimony to establish that the lantern was in substantially the same condition as when it left the factory. If that were the only deficiency in Plaintiff's proof, this Court would follow the Mississippi Supreme Court decision in *Daniels v. GNB, Inc.*, 629 So.2d 595 (Miss. 1993), wherein the Mississippi Supreme Court accepted Dr. Rosenhan as an expert. The Court concluded that circumstantial evidence was sufficient for a jury to allow "a reasonable juror to conclude that it was more probable than not that the carton immediately prior to the accident was in substantially the same condition as when it

Court then went on to say "proposed testimony must be supported by appropriate validation—i.e., 'good grounds' based on what is known." *Id.* In the *Watkins* case, *supra*, the Fifth Circuit quoted with approval from *Cummins v. Lyle Indus.*, 93 F.3d 362, 366–371 (7th Cir.1996);

"[A] district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks. . . . [T]his requirement places on the court the obligation to insure that the proffered testimony pertains to scientific knowledge. . . . [I]t must rule out subjective belief or unsupported speculation. . . ." 121 F.3d at 989, 990.

Dr. Rosenhan's testimony does not meet the criteria of *Daubert* or *Watkins* which this Court is compelled to follow. In *Kumho, supra*, the Court phrased the issue as follows: "The relevant issue was whether the expert could reliably determine the cause of [the] tire's separation." Under this criteria, Dr. Rosenhan's testimony is entirely too speculative for admission. Conflicts in testimony should be submitted to a jury, but speculative opinion testimony by an expert is precluded by *Daubert* and *Kumho*.

**542**

left the hands of Vicksburg Coke." *Id.* at 602; *quoting, Coca Cola Bottling Co., Inc. v. Reeves,* 486 So.2d 374, 383 (Miss.1986).

This Court will again reiterate that it is not finding that Dr. Rosenhan is not properly qualified as an engineering expert. The Court does find however that his opinions in regard to the facts of this case are too speculative to be admissible under Rule 702. His testimony must therefore be excluded.

■ Without the expert testimony of Rosenhan on the strict liability claim asserted by the Plaintiff, he has failed to offer proof on a matter which he bears the burden of proof at trial. *See Rudd v. Montgomery Elevator Co.,* 618 So.2d 68 (Miss.1993); *Wyeth Laboratories, Inc. v. Fortenberry,* 530 so.2d 688 (Miss.1988); *Hickox v. Holleman,* 502 So.2d 626 (Miss. 1987); and *Ford Motor Co. v. Matthews,* 291 So.2d 169 (Miss.1974). Plaintiff has offered no other testimony of any manufacturing defect, design defect or warning or instruction defect of the lantern. Failure to offer evidence on a critical matter upon which he bears the burden is fatal to his case. *See, In Re Municipal Bond Reporting Antitrust Lit., supra.*

This is indeed an unfortunate case and no Court can look at Plaintiff's injuries without having empathy. However, that does not allow this Court to ignore controlling precedent. Plaintiff in this case, as in all cases, has the burden of proof. Plaintiff is not entitled to recover merely because there was an accident and he was injured. He has the initial burden of offering proof of a defect in the lantern and thereby placing the responsibility for any damages he could prove on the Defendant. In this case, Plaintiff has not met his burden and summary judgment is appropriate.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Plaintiff's proffered expert testimony of Dr. A.K. Rosenhan is inadmissable under Rule 702 and should therefore be excluded.

IT IS FURTHER ORDERED AND ADJUDGED that because the Plaintiff has failed to offer proof on an essential element of his claim upon which he bears the burden of proof at trial this matter shall be dismissed with prejudice. A separate judgment shall be entered herein in accordance with Rule 58, Fed.R.Civ.P.